*Reversed and remanded.*

Opinion delivered October 27, 1886.

---

[No. 2155.]

A. R. PRICE *v.* THE STATE.

1. ASSAULT TO MURDER—INDICTMENT for assault with intent to murder is,
sufficient, without setting forth the means used or the manner in which,
the means were used to effectuate the murderous intention. See the
statement of the case for the charging part of an indictment *held* suffi-.
cient to charge an assault with intent to murder.

2. PRACTICE—NEW TRIAL.—See the statement of the case for evidence set;
forth in an application for continuance, which, considered in the light of
the evidence adduced on the trial, the continuance being refused, entitled
the defendant to a new trial.

APPEAL from the District Court of Marion. Tried below before.
the Hon. W. P. McLean.

The charging part of the indictment reads as follows:

*  *  *  "Did unlawfully, and with malice aforethought, make an assault upon the person of one James Sims, with the intent of him, the said A. R. Price, then and there to kill and murder the said James Sims, contrary," etc.

A term of two years in the penitentiary was the penalty assessed against the appellant.

J. W. Sims was the first witness for the State. He testified that early on the morning of the assault, as he was passing the Rosebud saloon, in Jefferson, Texas, he observed a number of persons congregated about it, and remarked to Charles Porter that "there are enough of these scabs to swear those fellows out." Defendant stepped up to witness and said: "G—d d—n it, we pay for what we get." Witness went on to the tailor shop, stopping on the bridge en route, where he told some parties what had passed at the Rosebud saloon. Defendant and another of the same name passed over the bridge, when Bowers, who was with witness, told him that he had better take care how he talked about the defendant, as he, the defendant, had once filed a complaint against a man. Witness left Bowers, and was soon sent for by Ward Taylor to attend to a case in the justice's court for a negro. Finding Taylor and his negro unprepared, witness went to the Federal Court, where he found the defendant. Witness then left the Federal Court and returned to the Rosebud saloon. Thence witness went back to the Federal Court, where he was approached by defendant, who told him not to look at him, defendant. Thence witness went into the clerk's office. Defendant and one Smith followed. Smith asked defendant who witness was, in a manner to attract witness's attention, and finally told witness that defendant wanted to make a charge against him. Witness then explained to Smith what had passed between himself and defendant, and remarked: "Nobody but a d—d rascal or a low down son of a b—h would take exception to what I said." Defendant put his hand behind him, and while witness and Smith were talking, approached the witness and said: "If you did not mean it, I will beg your pardon." Witness replied: "I believe you are just d—d enough rascal to bring some charge against me." Witness did not then know that defendant was a witness attending the Federal Court.

Witness presently passed down the street, and was standing on Dawson's corner when some one pointed out the defendant, in the rear of the store, and advised the witness to step down

that way and see the defendant run. The witness replied: "No, sir; you will not get me into such a scrape as that." Witness passed on to Bender's saloon, and when he got nearly in front of that saloon defendant fired, the shot striking witness's right arm. Witness told Kearney, who was walking the street ahead of him, to get out of his way, and ran into Bender's saloon. Defendant fired a second shot as witness passed into the saloon, and followed and fired a third shot as witness passed out at the rear of the saloon, and afterwards fired a fourth shot at witness. He fired four shots at witness, striking him twice. Witness was running when the second, third and fourth shots were fired.

The witness, on his cross examination, repeated substantially his testimony in chief, admitting that, at his first interview with the defendant, they cursed each other. He denied that he threatened to make the defendant eat dirt, or that he applied to him directly the epithet of son of a b—h. Witness was unarmed when fired upon by defendant, and was going to his place of business, and was not following the defendant.

W. F. Scott testified, for the State, that he saw the shooting. He was standing in front of the laundry when the first shot was fired. Sims dodged, sprang forward, and seized Kearney and threw his body around, and then fled into Bender's saloon. Defendant came out of the west door of the saloon with a pistol in his hand and fired a second shot. Sims was then at the side door. Defendant fired in the direction taken by Sims. Defendant fired again just as witness got to the door through which Sims went, and again as Sims passed out, and raised his hand to fire the fifth time just as witness caught and arrested him.

J. M. Bender testified, for the State, that just before the shooting took place, he was sitting at the front door of his saloon. He heard some one step in at the other door of the saloon, and got up to see what he wanted. He then saw the defendant, somewhat excited, standing inside of the west door, with a pistol in his hand. About this time Sims came along and the shooting occurred just about as related by the previous witnesses, except that Sims was still outside of the saloon when the second shot was fired.

Charles Kearney testified, for the State, that he was sitting in the east door of Bender's saloon when the shooting took place. Sims ran against him when the first shot was fired, and thence through the bar room, and he ran just behind Sims. Two more shots were fired, one of which passed through witness's collar.

Charles Porter, testified, for the State, that some little time before the shooting, Sims and the defendant were among the several parties congregated in the Rosebud saloon. Defendant made some remark when Sims asked witness: "What was it he said; that he was going to have some one arrested?" A few minutes later Sims remarked that a number of scabs were present, whereupon the defendant walked out of the saloon and made some remark that witness did not hear. Sims then remarked that he expected that he would be arrested. The State closed.

James North testified, for the defense, that he was in the office of the Clerk of the Federal Court a few minutes before the shooting took place. He heard Sims making some threats and cursing. A man named Smith, who was in the office, asked witness who Sims was, when Sims rose from his seat and said : "By God, my name is Sims," and began denouncing some one as a son of a b—h. Defendant said that if he could not be protected in the court room he would protect himself. He then called Mr. Reagan, who told Sims that he would have to arrest him if he undertook to intimidate witnesses. Sims replied that he would do the defendant up as soon as he struck the dirt. Defendant appeared to be seeking the protection of the Marshal and to be afraid of Sims. Witness appealed to Sims to go off and to have no trouble with defendant. Sims finally agreed to let defendant alone if defendant would not molest him, and went off. The shooting occurred about twenty minutes later. Before Sims left the defendant appealed to Marshal Reagan to arrest Sims, and pointed the latter out to the Marshal.

Doctor A. G. Clopton, testifying for the defense, said that two of the shots that struck Sims must have been fired by some one facing him.

Earl Barron testified, for the defense, that he was present in the Clerk's office when the quarrel between Sims and defendant took place. That quarrel occurred about twenty minutes before the shooting did. A Mr. Smith asked Mr. North who Sims was. Sims rose from his chair and said: "By God, my name is Sims. That G—d d—d son of a b—h is a fool," and proceeded to talk about something that had been said or done by defendant. Defendant went off and got Marshal Reagan. Reagan warned Sims not to intimidate witnesses. He then told Sims, after some talk, that he would not interfere if the quarrel was a personal matter. Sims then said to defendant : "You G-d d—d son of a

b—h, as soon as you strike dirt, I will make you eat dirt." This occurred but a few minutes before the shooting. Sims appeared to be very angry.

Cross examined, the witness said that he heard all that passed in the clerk's office. He did not hear Sims tell North that he would not bother Sims again. Defendant threw his hand behind him during the quarrel, as though he was " going for his pistol." Witness could not say positively that that motion of the hand was to get a pistol.

Mr. Smith testified, for the defense, that he met the defendant in the clerk's office of the Federal court a few minutes before the shooting. Defendant told witness that a man had cursed and denounced him as a d—d scab and a son of a b—h, and asked witness if he should take such abuse. Witness asked North the man's name. Sims jumped up and said: "By G—d, his name is Jim Sims. That son of a b—h is a fool." Witness replied that he ought not to call a man such names. Defendant said to Sims: "You wont go down stairs and call me that." Sims said that he would go, and would make defendant eat dirt. Defendant then told Sims that if he did not mean it he would shake hands with him. Sims replied that he would not shake hands with defendant, and left. Witness then went down stairs and saw defendant and called his attention to Sims standing off at a short distance, and advised him to avoid Sims. Defendant left, saying that he was going to get a drink. Sims went rapidly in the same direction. Soon afterwards the shooting occurred. Witness did not see the shooting.

B. Hall testified, for the defense, that immediately before the shooting he and Sims met in front of Dawson's corner, and conversed for a short time. Sims asked witness "how much it would cost him to thump that fellow?" If he asked "where that son of a b—h was" at that time, witness did not remember it. He applied that epithet to the defendant at another time, but not then. He then crossed over to Bender's saloon, and was standing with his side towards defendant when the first shot was fired. Witness heard three other shots fired.

Mr. Jacobs testified, for the defense, that he saw Sims just before he, witness, went into the Federal court room, which was a short time before the shooting. Sims said that he would whip the defendant as soon as he hit the ground.

Mr. Derken testified, for the defense, that just prior to the shooting he heard Sims say that as soon as the defendant struck

the ground he was his meat. He also heard him call the defend-
ant a "scab" and a "son of a b—h." A few minutes before the
shooting, the witness, while standing on Dawson's corner, heard
some one say: "There goes Sims now." Defendant walked
across the street towards Bender's saloon about five minutes be-
fore.

Mr. Price, a cousin of the defendant, testified in his behalf that
defendant told him on the morning of the shooting that a diffi-
culty was brewing. Going into the Federal court room, the wit-
ness heard several persons talking, and stopped to listen. North
told Sims that defendant was "codding" him. Sims told defen-
dant that he would make him eat dirt. Marshal Reagan was
about that time notified that a difficulty was imminent. Defend-
ant talked to witness about the impending trouble, and witness
told him to keep his mouth shut. Witness afterwards saw Sims
going across the street, and mentioned to Lewis his fears that a
fight was imminent. The first shot was fired just as Sims got to
the door of Bender's saloon. He was passing through the saloon
when the second and subsequent shots were fired. When wit-
ness last saw Sims prior to the shooting, which was just before
the shooting, he was standing on the street corner with his
hands in his pants. The second shot was fired by defendant
from the inside of the saloon door. Sims was then jumping but
not running, and had one hand on his bosom and the other on
his head. Witness heard Sims tell defendant in the court room
that he would settle with him if he would go down stairs. When
defendant subsequently offered his hand to Sims, Sims refused
it.

Mr. Weatherby testified, for the defense, in substance, that
defendant left the court house about ten minutes before Sims
did. Sims left, and shortly afterwards witness saw him on a
corner and heard him say: "Yonder is the son of a b—h. Now
is the time to get in my work." The shooting commenced shortly
afterwards. The defense closed.

John Amy testified, for the State, in rebuttal, that he was
standing on Dawson's corner with Sims just before the shooting.
Sims made no such remark as: "Yonder goes the son of a b—h;
now is the time to get in my work." If he had made such remark
at that time and place witness would have heard it.

J. W. Sims, recalled for the State, denied that he made the
remark on Dawson's corner, just before the shooting, imputed to
him by Weatherby.

The motion for continuance set up that by some of the absent witnesses the defendant would corroborate the several witnesses present as to the insults and abuse heaped upon the defendant in the Federal court room just before the shooting, and the threats then and there and elsewhere uttered against him by Sims. By another of the absent witnesses he expected to prove that, just before the shooting, Sims asked the witness the whereabouts of defendant, and being informed that defendant was in Bender's saloon, went rapidly to that saloon, entered it and approached defendant in a threatening and demonstrative manner, and it was not until then, if then, that the defendant fired upon Sims.

The motion for new trial raised the questions discussed in the opinion.

*W. H. Pope* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. An indictment for assault with intent to murder need not set forth the means used nor the manner in which the means were used to effectuate the murderous intention. (Browning v. The State, 2 Texas Ct. App., 47; Nash v. The State, *Id.,* 362; Hines v. The State, 3 Texas Ct. App., 483; Davis v. The State, 20 Texas Ct. App., 301.) In this case the indictment was sufficient (See Willson's Cr. Forms, No. 357), and the court did not err in overruling defendant's motion to quash.

Defendant's application for continuance disclosed sufficient diligence certainly as to one if not two of the witnesses for whom it was sought. But if we concede that it was a matter entirely discretionary with the trial court to overrule it in the first instance, yet we are of opinion that, when the evidence adduced at the trial made it apparent that the absent testimony was not only probably true, but very material to the interests of the defendant, it should have availed on the motion for a new trial, and the same should have been granted.

Other matters complained of may not occur on another trial. Because the court erred in overruling defendant's motion for a new trial, the judgment is reversed and the cause remanded.

*Reversed and remanded.*